**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**TINA L. FARLEY,**

**Plaintiff,**

**v.**                                                    **Civil Action No.: 5:12-cv-29**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**

**REPORT AND RECOMMENDATION**
**THAT CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED AND**
**COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT BE GRANTED**

**I.  Introduction**

A.      Background

Plaintiff, Tina L. Farley ("Claimant"), filed her Complaint on February 27, 2012, seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security ("Commissioner").[1]  Commissioner filed his Answer on May 3, 2012.[2]  On May 30, 2012, Claimant filed a Motion for Summary Judgment.[3] On June 28, 2012, Commissioner filed a Motion for Summary Judgment.[4] On July 11, 2012, Claimant filed a Response in Opposition to Commissioner's Motion for Summary Judgment.[5]

---

[1] Dkt. No. 1.

[2] Dkt. No. 6.

[3] Dkt. No. 10.

[4] Dkt. No. 14.

[5] Dkt. No. 16.

B.     The Pleadings

    1.     Claimant's Motion for Summary Judgment & Memorandum in Support

    2.     Commissioner's Motion for Summary Judgment & Memorandum in Support

C.     Recommendation

I recommend that:

    1.     Claimant's Motion for Summary Judgment be **DENIED** because the Appeals Council had the authority to issue a decision without an additional hearing; because it properly considered the statements of one of Claimant's medical sources; because it properly found that certain of Claimant's alleged impairments were not severe at step two of the sequential evaluation process; and because substantial evidence support's the ALJ's credibility determination.

    2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.     Procedural History

Claimant filed an application for Disability Insurance Benefits on January 14, 2009, alleging disability since November 1, 2008[6] due to diabetes, carpal tunnel syndrome, bulging discs in the neck, headaches, a herniated disc, trigger finger and thumb, tennis elbow on the right side, and a cataract in one eye. (Tr. 153). The application was initially denied on April 30, 2009 and on reconsideration on August 3, 2009. (Tr.53-57, 70-72).  On August 21, 2009, Claimant

---

[6]Plaintiff originally stated her onset date was November 9, 2006, but she amended her alleged onset date at the administrative hearing. (Tr. 47, 153).

requested a hearing before an ALJ and received a hearing on April 6, 2011 in Huntington, West Virginia.

On April 19, 2011, the ALJ issued a decision adverse to Claimant finding that she was not under a disability within the meaning of the Social Security Act. (Tr. 25). Claimant requested review by the Appeals Council, and on November 10, 2011, the Appeals Council granted Plaintiff's request for review pursuant to 20 C.F.R. § 404.970, noting that the ALJ's decision included an erroneous finding that Plaintiff's date last insured was December 31, 2010 instead of December 31, 2011. (Tr. 125-28). On January 9, 2012, the Appeals Council then made findings about the additional evidence submitted and issued a decision adopting the ALJ's prior findings, but modifying them to reflect the correct date last insured. (Tr. 4-6). Claimant then filed this action, which proceeded as set forth above, having exhausted her administrative remedies.

B.      Personal History

Claimant was born on July 9, 1970, and was thirty-eight years old at the time of the alleged onset. (Tr. 30). Claimant has a high school diploma. She has prior work experience as a personal care provider and as a secretary. (Tr. 32, 428).

C.      Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that the Claimant is not under a disability and can still perform work in the national economy:

Claimant was diagnosed with diabetes at age ten. She now checks her blood sugar levels seven times per day, and uses an insulin pump. (Tr. 622). She has also been treated for this condition at the Advanced Diabetes and Endocrine Center and has received insulin therapy. (Tr.

360-81, 623).

On November 6, 2008, Claimant saw her primary care provider with complaints of neck pain and discomfort, rating the pain a six on a scale of one through ten. (Tr. 471). She reported that Voltaren helped her with the pain. (Tr. 471). On December 4, 2008, an MRI of Claimant's lumbar spine came back normal but an MRI of her cervical spine showed left C5-C6 herniation. (Tr. 388-89). Claimant's doctor noted that because conservative therapies failed, Claimant was a candidate for physical therapy, chiropractic care or anterior cervical discectomy and fusion at C5-C6. (Tr. 388-89). On January 8, 2009, Claimant saw Vincent J. Miele, M.D. for neck and interscapular pain. (Tr. 427). His examination revealed that she had muscle tenderness in her cervical spine but her neurological examination was normal. (Tr. 429). On January 13, 2009, Claimant saw Lucas J. Pavlovich, M.D. about her left trigger thumb and tennis elbow. (Tr. 439). On February 23, 2009, Claimant was referred to a physician to discuss her neck pain, but he did not recommend surgery at that time. (Tr. 894). On March 6, 2009, Fulvio Franyutti, M.D., a state agency physician, completed a physical RFC assessment for Claimant. He found that she could perform medium work with certain postural and environmental limitations. (Tr. 575-82). On April 17, 2009, consultative psychologist Larry Legg, M.A. examined Claimant. She reported to him that she had been depressed since age 19, and had poor concentration, felt hopeless, and experienced decreased appetite and energy levels. He diagnosed her with early onset dysthymic disorder. (Tr. 602). On April 28, 2009, Dr. Pavlovich performed a left trigger and long trigger finger release. (Tr. 630). On April 30, 2009, Joseph A. Shaver, Ph.D, a state agency psychologist, completed a psychiatric review technique form and a mental RFC assessment for Claimant. He found that she retained the mental capacity to work in routine, low pressure

situations that did not require high levels of concentration. (Tr. 620). On May 14, 2009, Claimant reported that she was "doing pretty well" after her trigger release surgery and the doctor noted the incisions were well-healed, she was able to oppose the thumb to the pad of the finger, and should could make a full fist. (Tr. 629).

On May 28, 2009, Claimant saw Claudette E. Brooks, M.D. with complaints of headaches. (Tr. 664-65). On examination, her cranial nerves were found to be intact and Claimant noted that the "medicine [was] still doing pretty well for her." (Tr. 664).

On June 3, 2009, Claimant told her primary care provider that she was unable to work because of neck and back pain, and she rated her pain level as a four out of ten. On June 11, 2009, Claimant returned to Dr. Pavlovich, this time with complaints about her right trigger thumb and right tennis elbow release. (Tr. 802). On July 16, 2009, Claimant saw her primary care physician and rated her pain level as six out of ten, although her primary care provider noted that she was still able to use a tanning bed. (Tr. 645). On August 13, 2009, Claimant complained of tenderness and decreased range of motion. (Tr. 643). On August 31, 2009, Claimant's physical examination results were normal although her doctor noted she had a flat affect. (Tr. 644). On September 29, 2009, Claimant had an increased heart rate and was mildly anxious. (Tr. 892). On October 30, 2009, she again complained of cardiac symptoms. (Tr. 890).

On January 14, 2010, Debra Cutlip, PA noted that Claimant elected to have neck surgery for her chronic neck pain. (Tr. 886). On March 24, 2010, Claimant again told her primary care physician that she could not work due to pain in her shoulders, neck, back, and hands. She also reported her pain level as being a five out of ten. (Tr. 881). On April 5, 2010, Claimant's cervical spine MRI showed degenerative disc disease and a possible superimposed protrusion at the C5-

C6 levels. (Tr. 741). On June 14, 2010, Claimant had her right trigger thumb and right tennis elbow released by Dr. Pavlovich. (Tr. 703-04; 804). At Claimant's follow-up appointment after the surgery, Dr. Pavlovich noted that she was able to make a complete fist, however she lacked about thirty degrees of elbow extension. (Tr. 803). On August 11, 2010, Claimant returned to Dr. Pavlovich with complaints that she felt a tear on the lateral side of her elbow when she was lifting something. However, the doctor noted she had no pain in her forearm and only instructed her to take an anti-inflammatory drug. (Tr. 802). On September 21, 2010, she again saw Dr. Pavlovich, this time with complaints of swelling and pain in her thumb. (Tr. 801). On October 13, 2010, Claimant rated her pain level as a five out of ten, and her primary care provider referred her to Cathy McCoy, F.N.P.C.B. for further treatment. (Tr. 878).

On November 1, 2010, Claimant saw Cathy McCoy for treatment for the first time as a new patient and had her medications refilled. (Tr. 876). On November 16, 2010, Claimant saw Heather Reesman, P.A. for elbow pain and she was given a tennis elbow strap. (Tr. 800). On February 10, 2011, Claimant denied any present problems and saw Cathy McCoy for refills of her Flexeril and Pravastin. (Tr. 874-75).

On April 18, 2011, Claimant again saw Dr. Miele with complaints of pain, but he felt she was not a surgical candidate. (Tr. 916). On April 27, 2011, Claimant saw Shelly P. Kafka, M.D. for a rheumatological consultation. (Tr. 973-77). Dr. Kafka found she had tenderness in her lumbar and cervical spines, a decreased range of motion of her cervical spine, and a normal range of motion of her lumbar spine. (Tr. 976). Dr. Kafka diagnosed Claimant with polyarthralgias and recommended laboratory tests and x-rays of her hands, but found that she did not meet the criteria for fibromyalgia. (Tr. 977). When Claimant's x-rays came back, x-rays of

her right hand showed degenerative changes involving the distal phalanx of the fourth finger. (Tr. 986-87). On May 5, 2011, in a follow-up appointment with Ms. McCoy, Claimant again reported a pain level of five out of ten. (Tr. 1002). On May 31, 2011, Claimant returned to see Dr. Kafka and she diagnosed her with psoriatic arthritis. (Tr. 965-66). On June 7, 2011, Claimant saw Mohamed Fahim, M.D., a pain management specialist, who found she had mild tenderness over the cervical facet joints, neck, right lumbar facet joints of the spine, and right lumbar facet joints of the hips. (Tr. 1070). He also noted that an MRI of her lumbar spine showed a minimal disc bulge at the L4-L5 with mild facet arthropathy. (Tr. 958). In another appointment with Dr. Kafka on July 26, 2011, Claimant was noted to have a normal musculoskeletal examination but a tender right ankle and proximal interphalangeal joint. (Tr. 960-61). On August 4, 2011, in another appointment with Ms. McCoy for refills, she noted that her examination was normal and her lipid panel was within normal limits. (Tr. 998-99). On August 24, 2011, Dr. Fahim gave Claimant a lumbar epidural steroid injection at the L4-L5 level. (Tr. 1064).

On September 19, 2011, Dr. Brooks noted that she appeared to be a healthy patient, and Claimant reported having only one to two headaches per month. (Tr. 925-27). On September 29, 2011, Dr. Fahim noticed marked tenderness over Claimant's sacroiliac joints and recommended bilateral sacroiliac joint steroid injections. (Tr. 1061). After Claimant's first injection on October 21, 2011, she reported her pain level was zero. (Tr. 1059). On October 26, 2011, Dr. Kafka noted claimant had thoracic tenderness and mild tenderness in the metacarpophalangeal joints, leading him to diagnose her with polyarthritis. (Tr. 951). On October 28, 2011, Dr. Fahim administered a second bilateral sacroiliac joint steroid injection and Claimant again reported her pain level was zero afterwards. (Tr. 1058). Claimant again saw Ms. McCoy on November 22, 2011, and she

reported that she had seen a rheumatologist, started on Tramadol, and was "doing a lot better with that." (Tr. 995). Ms. McCoy also completed a Medical Assessment of Ability to Do Work-Related Physical Activities form. (Tr. 1053-55). After answering a series of questions about Claimant, she concluded that Claimant is unable to work. (Tr. 1055).

D.    Testimonial Evidence

Claimant testified that her neck is what bothers her the most, but her back, arms, and hands also hurt. (Tr. 33). She also testified that her feet swell if she is on them for too long. (Tr. 34). Claimant stated that she has had surgery on her hands, two thumbs, one of her fingers, and her right tennis elbow, but the surgeries did not help. (Tr. 35).

Claimant also testified about the pain she experiences. She testified that she has sharp pains in her arms, hands, neck, and back. Certain activities aggravate the pain, or even standing or sitting can aggravate the pain. (Tr. 34-35). Claimant testified that she takes medication for the pain, but it does not really ease the pain, and it causes negative side effects such as swelling, weight gain, mental confusion, and loss of concentration. (Tr. 35).

She testified that she is not able to walk far without having to stop or sit down. (Tr. 36). She can only stand for around fifteen minutes. (Tr. 36). She also has trouble sitting because it causes her back pain. (Tr. 36). Her hands cramp up and she has trouble using them to do simple tasks, like carrying items from the car into the house. (Tr. 36). She has trouble sleeping because her neck and back bother her, and she will get up several times a night. (Tr. 37).

E.    Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the

Claimant's alleged impairments affect her daily life.

Claimant is married and lives together with her husband. (Tr. 31). She testified that she has a West Virginia drivers license and she is able to drive, however if it is a longer drive, someone goes along with her to help. (Tr. 31).

She testified that she is able to shower by herself, but she has trouble getting in and out of the bathtub. (Tr. 37). She testified that she cannot stand at the stove very long, or wash dishes, but she will prepare small meals. (Tr. 37). During the day she is restless and is constantly moving up, down, back and forth to get comfortable. (Tr. 37). She testified that she does very few chores around the house with dusting being the only chore she can complete. (Tr. 37).

### III.  The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant's brief alleges that the ALJ erred by: 1) denying a portion of her claim without providing Claimant with the opportunity for a hearing; 2) failing to properly consider the opinion of Claimant's treating source; 3) improperly rejecting two of Claimant's severe impairments; and 4) making an improper credibility determination.

Commissioner contends that the Appeals Council was empowered to issue a decision without an additional hearing; that the Appeals Council properly considered Ms. McCoy's opinion; that the ALJ appropriately considered and found Claimant's headaches, carpal tunnel syndrome, trigger thumb, trigger finger, and tennis elbow not to be severe at step two; and that substantial evidence supports the ALJ's credibility assessment.

B.     The Standards.

1.     Summary Judgment.  Summary judgment is appropriate if  "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

   2. Judicial Review. Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

C. Discussion

1. Whether the Appeals Council Erred in Failing to Grant Claimant and Additional Hearing and Whether it Failed to Properly Evaluate the Claim

   Claimant first argues that although the Appeals Council correctly recognized that the ALJ erred by using the wrong date last insured, the Appeals Council erred by not granting Claimant a hearing to allow her to present evidence from the "unadjudicated period." Claimant argues that she is entitled to have a hearing on the entirety of her claim. Furthermore, Claimant argues that the Appeals Council's decision was in error because it did not follow the sequential evaluation process.

   Commissioner argues that the Appeals Council has the statutory authority to issue a

10

decision without granting a second hearing. As to Claimant's argument that the Appeals Council did not follow the sequential evaluation process in rendering its decision, Commissioner argues that the decision was proper because it affirmed and adopted the ALJ's findings which did discuss all five steps of the sequential evaluation process, and merely modified them to reflect the correct date last insured.

Claimant asserts that the Appeals Council denied her due process by not granting a hearing at which Claimant could present evidence on the so-called "unadjudicated period."[7] An applicant for social security disability benefits has a property interest in those benefits protected by the Fifth Amendment. See Richardson v. Perales, 402 U.S. 389, 401-02 (1971)(assuming procedural due process protections apply to a social security disability claim); Flatford v. Chater, 93 F.3d 1296, 1304-05 (6th Cir. 1996). The Due Process Clause requires that an individual be afforded notice and an opportunity to be hear before the deprivation of a protected interest through adjudication. Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). In the context of a social security hearing, due process requires that the proceedings be "full and fair." Flatford, 93 F.3d at 1305 (quoting Perales, 402 U.S. at 401-02). In order to be "full and fair" it must pass constitutional muster according to the Mathews v. Eldridge factors which include: consideration of the private interest that will be affected by the official action; the risk of an erroneous deprivation through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including

---

[7]Claimant had a full evidentiary hearing on April 6, 2011, however, despite being asked if she had "anything else about any of [her] conditions that [she] would like to add," the ALJ did not hear or admit any testimony or evidence related to Claimant's conditions from the period between January 1, 2011 and April 19, 2011. (Tr. 42).

the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. 424 U.S. 319, 335 (1976).

Here, the private interest at stake is great. However, the reopening of procedures afforded Claimant the opportunity to have his new or "unadjudicated" evidence considered. The Appeals Council gave Claimant the opportunity to submit new evidence related to the missing time period. The letter the Appeals Council sent to Claimant indicated that she could "send [the Appeals Council] more evidence or a statement about the facts and law in your case," and it also informed him that he could ask for an appearance before the Appeals Council. Claimant did in fact submit more evidence, but there is no evidence in the record that she asked for an appearance. Furthermore, if there was a requirement that a second hearing must be held, this added requirement would only "drain SSA resources and impose a substantial administrative burden for little or no increase in the accuracy of benefits determinations." Ferriell v. Comm'r of Soc. Sec., 614 F.3d 611, 621 (2010). Accordingly, the procedures used in this case do not violate the Due Process Clause and the Fifth Amendment does not provide a basis for this Court to disturb the Appeals Council's decision.

Claimant's next argument, that the decision the Appeals Council issued was grossly deficient, is equally without merit. As a rule, pursuant to 20 C.F.R. § 404.979,

> After [the Appeals Council] has reviewed all the evidence in the [ALJ] hearing record and any additional evidence received...the Appeals Council will make a decision or remand the case to an [ALJ]. The Appeals Council may affirm, modify, or reverse the [ALJ's] hearing decision or it may adopt, modify or reject a recommended decision. If the Appeals Council issues its own decision, it will base its decision on the preponderance of evidence.

In addition, when evidence is submitted for the first time to the Appeals Council, it is considered part of the record upon which the final decision is based. Higginbotham v. Barnhart, 405 F.3d

332, 337 (5th Cir. 2005). Here, in keeping with this statutory requirement, the Appeals Council,

considered the prior record as well as the additional evidence listed on the Supplemental List of

Exhibits. It stated that "[a] portion of the evidence submitted by the claimant is duplicative of

evidence already in the record," (Tr. 4) but that the additional evidence submitted that was not

duplicative "[did] not show that the claimant's condition worsened." (Tr. 5). The Appeals

Council then went through the process of evaluating the additional evidence, including a

statement from Cathy McCoy, FNPBC, which it found to be "inconsistent with the record as a

whole and with her own notes." It also evaluated an update MRI of Claimant's lumbar spine, but

noted that it "show[ed] only mild degenerative changes." (Tr. 5). Finally, the Appeals Council

concluded that "this evidence is essentially cumulative and does not show any significant

worsening of the claimant's condition from January 1, 2011, through April 19, 2011." (Tr. 5).

Given this decision, this Court finds that the Appeals Council adequately evaluated the newly

submitted evidence and supported its decision with substantial evidence. Furthermore, the Court

finds no merit to Claimant's argument that the Appeals Council failed to follow the mandatory

five-step sequential evaluation process. In this case, the decision issued was merely a corrective

decision, whereby the Appeals Council adopted the ALJ's findings and conclusions, which

Claimant does not argue were deficient for not following the five-step sequential evaluation

process. The Appeals Council then went on to extend the ALJ's findings and conclusions

through April 19, 2011 based on its consideration of the record and newly-submitted evidence.

Accordingly, the Appeals Council has not violated its duty to properly consider the evidence.

2.     Whether the Appeals Council Erred in Failing Follow the Treating Physician Rule

        Claimant next contends that the Appeals Council erred by failing to follow the treating

physician rule.  More specifically, Claimant argues that the Appeals Council did not provide

specific reasons for assigning little weight given to the treating source's medical opinion that

Claimant could not work.

All medical opinions are to be considered in determining the disability status of a

claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Nonetheless, opinions on ultimate issues, such

as RFC and disability status under the regulations, are reserved exclusively to the ALJ, or in this

case to the Appeals Council.  20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1).  Statements by

medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ or

Appeals Council must consider all medical findings and evidence that support such statements.

Id.  The opinion of claimant's treating physician is entitled to great weight and may only be

disregarded if there is persuasive contradictory evidence.  Evans v. Heckler, 734 F.2d 1012,

1015 (4th Cir. 1984).  Controlling weight may be given only in appropriate circumstances to

medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's

impairment(s), from treating sources, when the opinion is 1) well-supported by medically

acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other

substantial evidence in the case record.  20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590

(holding that a treating physician's medical opinion must be given controlling weight only when

it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence" in the record).

While the credibility of the opinions of the treating physician are entitled to great weight,

it may be disregarded if there is persuasive contradictory evidence.  Evans, 734 F.2d at 1015.  To

decide whether the impairment is adequately supported by medical evidence, the Social Security

Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527(d)(2) (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

At the outset, it is noted that Ms. McCoy is a nurse practitioner, and, therefore, is not an "acceptable medical source" by statute. See 20 C.F.R. § 416. 913.[8] However, in Gomez v. Chater, 74 F.3d 967, 972 (9th Cir. 1996), the Court held that the opinion of a nurse practitioner could be viewed as an acceptable medical source where the record clearly established that "she

---

[8] The term "acceptable medical sources" is defined to include (1) licensed physicians, (2) licensed osteopaths, (3) licensed or certified psychologists, (4) licensed optometrists, (5) persons authorized to send the Secretary a copy or summary of the medical records of a hospital or other institution, and (6) the "report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source." 20 C.F.R. § 416. 913 (a).

was acting as an agent" of the doctor. In this case, the record provides no evidence to the contrary. It is clear that Ms. McCoy is given a significant amount of autonomy in her role as a nurse practitioner for Webster County Memorial Hospital. There can be little doubt that Ms. McCoy acts as an agent of the doctors. She examined Claimant on many occasions, for example on March 15, 2012; February 10, 2011; May 5, 2011; August 4, 2011; and November 22, 2011, among other occasions. Her signature alone appears on most of Claimant's treatment notes, and she was responsible for reviewing liver enzyme levels, refilling medications, diagnosing illnesses, making continuing treatment recommendations, and other tasks that a treating doctor would be expected to complete. Therefore, Ms. McCoy is considered to be an "acceptable medical source."

However, even treating Ms. McCoy's opinion as the opinion of a treating source, the ALJ did not err in his consideration of this medical opinion. Opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ or the Appeals Council. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Moreover, the ALJ is not obligated to "give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2)." § 404.1527(e)(3). Therefore, in this case, the ALJ did not err by giving little weight to these opinions as "the issue of disability is reserved for the Commissioner." (Tr. 24). Furthermore, in rejecting the opinions of Ms. McCoy on Claimant's disabled status, the Appeals Council noted that it "considered Ms. McCoy's opinion in accordance with Social Security Ruling 06-3p. Ms. McCoy's statement in [the physical functional capacity assessment] is inconsistent with the record as a whole and with her own notes, which indicate that she encouraged the claimant to walk and exercise more." (Tr. 5).

The Appeals Council discredited her opinion because the record revealed that she prescribed conservative treatment such as walking and exercising, and that she clearly believed Claimant was capable of walking and exercising, which undercuts her opinion that Claimant is totally disabled. The Appeals Council also found that Ms. McCoy's statement was inconsistent with the additional MRI that was submitted, which indicated only mild degenerative changes. (Tr. 5). In this case, the Appeals Council was only tasked with determining whether the Claimant's condition had worsened to the point of rendering her disabled during the "unadjudicated period" from January 1, 2011 to April 19, 2011. The Appeals Council clearly found that it had not, and in coming to this conclusion, it discredited the opinion of Ms. McCoy, but properly did so by evaluating the record and supporting its decision with substantial evidence. Accordingly, the Appeals Council did not commit error.

2.      Whether the ALJ Erred in Failing to Make a Proper Evaluation at Step Two of the Sequential Evaluation

Claimant argues that the ALJ committed plain error by finding that Claimant failed to establish she had any severe impairment. Specifically, Claimant argues that the ALJ failed to take into account the overwhelming medical evidence of Claimant's severe headaches as well as her carpal tunnel syndrome, trigger thumb, trigger finger, and elbow epicondylitis. The Commissioner contends that Claimant failed to meet her burden of proving she had an impairment that significantly limited her ability to do basic work activities. Additionally, Commissioner contends that the ALJ accounted for any potential functional limitations caused by Claimant's alleged problems.

"An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may

require." 42 U.S.C. § 423(d)(5)(A). The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3). Thus, at step two of the sequential evaluation process, the ALJ is required to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. § 404.1520(c). A severe impairment is "one which impacts more than minimally on an individual's functional ability to perform basic work activities." Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). In order to properly evaluate the severity of mental impairments, the ALJ must consider the factors contained in section 12.00 of the Listing of Impairments in Appendix 1. The factors contained in section 12.00 are separated into four broad functional areas in which the Commissioner rates the degree of claimant's functional limitations, specifically, 1) activities of daily living; 2) social functioning; 3) concentration, persistence or pace; and 4) episodes of decompensation. 20 C.F.R. § 404.1520(a).

In this case, the Court cannot say that the ALJ erred by finding that Claimant did not suffer from a severe impairment on her date last insured. The ALJ found at Step two that through the date last insured, Claimant had the following severe impairments: diabetes, degenerative joint disease of the cervical and lumbar spine, and depression. (Tr. 16). The ALJ's findings will be upheld as long as they have substantial evidence to support them. Hayes, 907 F.2d at 1456. In this case, the ALJ's finding that Claimant's headaches are not severe is supported by substantial evidence. For example, Claimant's neurological examination on January 8, 2009, was normal. (Tr. 429). In April 2009, Claimant stated that she only had tension headaches from time to time. (Tr. 599). On May 28, 2009, Claimant stated that her "medicine

[was] still doing pretty well for her" with respect to her headaches. (Tr. 664). On May 5, 2011, Claimant told her medical provider that she was not having headaches. (Tr. 1002). Finally, on September 19, 2011, Claimant stated to Dr. Brooks that she was tolerating her medications well and that she was only having one to two headaches per month. (Tr. 925). Based on this medical evidence of record, the ALJ found that Claimant there were no "acute findings related to this condition, which appears to be well-controlled with medication and only an occasional exacerbation." (Tr. 17).

Similarly, there is substantial evidence to support the ALJ's decision that Claimant's carpal tunnel syndrome, trigger thumb, trigger finger, and tennis elbow are not severe impairments. For example, on May 14, 2009, Claimant reported that she was "doing pretty well" after her trigger release surgery and the doctor noted the incisions were well-healed, she was able to oppose the thumb to the pad of the finger, and should could make a full fist. (Tr. 629). Likewise, after she had her right trigger thumb and right tennis elbow release in 2010, the doctor reported that she was doing well and that she could make a fist. (Tr. 803). When Claimant saw her physical therapist in 2010, the therapist found that she has improved significantly and that her strength and range of motion were almost full. (Tr. 1034). Based on this medical evidence, the ALJ found that "the surgical intervention and treatment plans appear[ed] to control the claimant's condition." (Tr. 17). Based on the evidence, this Court cannot say that the ALJ committed error.

3.    <ins>Whether the ALJ Erred in Failing to Make a Proper Credibility Determination</ins>

Next, Claimant argues the ALJ erred by failing to make a proper credibility determination. More specifically, Claimant argues the ALJ did not comport with the

requirements of 20 C.F.R. § 404.1529(c)(4) which directs the ALJ to evaluate Claimant's credibility compared to the record evidence, rather than to the ALJ's own RFC assessment. Furthermore, Claimant argues that the ALJ's emphasis on her statements about her daily activities, her statements about being thrown from a vehicle, the fact that she was prescribed medications, an improperly filled out form, and her claims that she is practically homebound was inappropriate.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment." Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Craig, 76 F.3d at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id.

Additionally, the regulations set forth certain factors for the adjudicator to consider to determine the extent to which the symptoms limit the claimant's capacity to work:

> 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) Type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any

measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. 404.1529(c) and 416.929(c) (2010).

Accompanying factors are provided in SSR 96-7p that the adjudicator must also consider in addition to the objective medical evidence when assessing the credibility of an individual's statements. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about claimant's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work. SSR 96-7p.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

Claimant's argument regarding the ALJ's credibility determination is without merit. First, her citation to Bjornson v. Astrue is misguided. In that case, the Seventh Circuit chastised an ALJ for using boilerplate language that implied he had first made his RFC assessment, and

then used that assessment to find that Claimant's subjective complaints of pain were not credible without citing to other evidence in the record. Such an analysis, without more, would be logically inverted. In this case, the ALJ did use the same boilerplate phraseology, but, as the Seventh Circuit clarified in Clifton v. Astrue, No. 11C1141, 2012 WL 2277860, at *18 (N.D. Ill. June 18, 2012), this sort of boilerplate language is only inadequate if it is used *by itself* to make a credibility determination. That kind of boilerplate language is only impermissible if it "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that Claimant's complaints were not credible." Bjornson at 645. Here, the ALJ uses the boilerplate language only after he has discussed the in-depth reasons for his credibility determination, thus the ALJ did not err in this regard.

Furthermore, in coming to his conclusion that Claimants complaints seem to be inflated in order to gain benefits, the ALJ complied with the two-part test in Craig. First, the ALJ found, in accordance with step one, that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr.21). Second, in accordance with step two, the ALJ explained his reasoning for discrediting Claimant's testimony. (Tr. 22). First, he noted that functions she was able to perform and the activities she was able to engage in, including keeping up with her grooming and hygiene, household maintenance, communicating with others, responding to questions without a loss of concentration of attention, and maintaining social relationships. Further, the ALJ noted that Claimant was likely inflating her symptoms because the daily activities she engaged in were not those someone with her alleged disabilities would be able to perform. For example, she stated that she packs a lunch for her husband, she checks her blood sugar, she fixes herself breakfast, she watches T.V., she folds laundry, she

visits her mom and her sister, spends time with her nephews, and occasionally goes to the doctor, runs errands, and shops. (Tr. 23, 170, 601-02, 645, 881). The ALJ also noted other inconsistencies between the record and Claimant's subjective complaints of pain. He noted that although Claimant stated that she was still in pain because her medications were not effective at relieving it, she still continued to take them. (Tr. 23). He noted that because it is unlikely that a patient would continue to take medications that were having no effect, Claimant must have been overstating her pain levels. He also mentioned that she stated she had been thrown from a vehicle in an accident that occurred outside the onset date, but that the ER record shows she was wearing a seatbelt and was only treated for whiplash.(Tr. 711-715). Finally, she indicated that she used crutches, a walker, a wheelchair, a cane, leg braces, a splint, an artificial limb, a hearing aid, and glasses, which also obviously inflated her limitations. (Tr. 23, 171). Accordingly, the Court finds the ALJ properly decided to discredit Claimant's statements regarding subjective allegations of pain, limitations and overall disability and supported this decision with substantial evidence.

For the above reasons, Claimant's assertions do not warrant relief.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **<u>DENIED.</u>**

2.      Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>**.

Any party who appears *pro se* and any counsel of record, as applicable, may, on or before **September 7, 2012**, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A

copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 24, 2012

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE